## Bowling Green Railway Company v. Lewis' Administrator.

(Decided February 24, 1914.)

### Appeal from Warren Circuit Court.

1. Carriers—Passengers—Creation of Relation Between—Street Railroads.—Where the motorman in charge of a street car, to whom has been delivered a boy with information that he had been engaged in lubricating the tracks of the street railway company with soap, takes the boy on to the car with him, informing the boy that he would be delivered over to the officers of the law, the relation of carrier and passenger was created between such boy and the street railway company; and it owed to him the same duties as it owed any other passenger.

2. Carriers—Passengers—Duty of the Carrier to Protect Passengers. —Where such conductor took the boy on to the front platform of the car and compelled him to ride thereon, the carrier is responsible for the negligence of the motorman in that respect by reason of which negligence the boy was injured.

3. Master and Servant—Liability for Injuries to Third Persons— Scope of Employment.—The act of the motorman in charge of a street car in compelling a boy to become a passenger thereon was within the scope of the employment of the servant, and one for the consequences of which the master is liable.

4. Trial—Evidence—Competency as Part of Res Gestae.—In an action for damages to a boy who was captured by two men while in the act of soaping street railway tracks, and by them afterward delivered over to a motorman in charge of a street car, by whose negligence the boy while a passenger upon the car was thereafter injured, evidence as to what transpired between the two men and the boy before they came into the presence of the motorman held incompetent, but not prejudicial under the circumstances.

T. W. & R. C. P. THOMAS and SIMS & RODES for appellant.

J. H. GILLIAM and BRADBURN & BASHAM for appellee.

OPINION OF THE COURT BY JUDGE HANNAH—Affirming.

On the night of October 31, 1910, Hallowe'en, a number of boys were abroad on the streets of the city of

Bowling Green, engaged in the perpetration of those pranks which unfortunately have come to characterize the modern celebration of this anniversary. One of the forms of mischief indulged in by them on that occasion was the lubrication with soap of the tracks of the street railway company.

One of appellant's street cars, being operated on State street, encountered one of these lubricated places, and was unable to proceed until the motorman alighted and sanded the track, by which means he was enabled to pass it. The car reached the corner of State and Twelfth streets, and as it turned up Twelfth street, some boys pulled the trolley pole from the overhead wire. There were no passengers on the car and it was being operated by a motorman alone, there being no conductor; and at his request, a stranger named Igleheart, rode upon the rear platform of the car to prevent further interference of that kind until the head of Twelfth street was reached. There the car again encountered one of the "soaped" places and was unable to proceed.

In the meantime, a social gathering was being held in a private residence near where the car stopped; and there had been displayed in one of the windows of said residence the traditional "pumpkin-head" with a light in it. Some one had thrown a missile and knocked this object out of the window, whereupon a couple of the male guests ran out into the street in search of the perpetrators of this act. They encountered a number of boys engaged in the "soaping" of the street railway tracks. The boys fled at the approach of the two men, Brownfield and Meyers, who thereupon continued in the direction taken by the boys, and again came upon them engaged in the same act. The boys again fled; but one boy, Herman Lewis, was captured by the men, and was taken by them to the place where the street car heretofore mentioned was still standing, the motorman being engaged in putting sand on the rails. They informed the motorman that they had captured one of the boys who had "soaped" the tracks, saying, "You can have him; now take him on and turn him up." The motorman asked the boy for his name. He replied that his name was George Lawrence, whereupon a passer-by declared that he was acquainted with the boy whose name was given, and that this boy was not he whom he claimed to be. The motorman then asked the Lewis boy for the names of

his companions, and being refused this information, he took the Lewis boy's cap and placed it upon his own head. He then changed the trolley pole so that the car could be run back down Twelfth street, being compelled to abandon any further attempt to proceed on account of the condition of the tracks. One of the men who had the boy in charge placed him on the rear platform of the car, and the motorman told him he would take him down town to a policeman and "turn him over." He led the Lewis boy through the car and out on the front platform thereof, the boy crying and begging to be released. After the car had proceeded about two blocks down Twelfth street, the Lewis boy in some manner fell under the wheel of the car, and was so badly crushed that he died soon thereafter.

An action was thereupon instituted in the Warren Circuit Court by his administrator for damages against appellant, and the court sustained a demurrer to the petition. On appeal, the judgment was reversed. See Lewis' Admr. v. Bowling Green Railroad Company, 147 Ky., 460, 144 S. W., 377.

A trial of the action was thereafter had on November 8, 1912, and the jury returned the following verdict: "We, the jury, find for the plaintiff the sum of six thousand dollars compensatory damages. We, the jury, find for plaintiff in the sum of three thousand dollars punitive damages."

On motion of the defendant, that verdict was set aside, and upon a second trial of the case, on February 19, 1913, the jury returned the following verdict: "We, the jury, find for the plaintiff, six thousand dollars, compensatory damages." The Street Railway Company appeals.

It is the contention of appellee that the motorman continued his hold on the boy after conducting him to the front platform of the car, operating the car with one hand and holding the boy with the other; and that the boy endeavored to jump off the front platform of the car; and that the motorman in trying to prevent his escape drew him under the wheels of the car and caused his death. However, the evidence fails to bear out this contention.

One of appellee's witnesses says that he saw the boy on the platform with the motorman; that the motorman had hold of the boy's arm or shoulder with his left hand,

and was operating the car with his right hand. And "after the car had got by, we got out in the street to see what he was going to do with him, and the boy jumped off or fell off or was pushed off or something. He came out face first and one foot went under the front wheel on the left side. He screamed the first time a short scream, and it drug him along under the car, and he screamed then one long scream, and I started to run to him, and when I got there he was wedged up under the wheels beneath the rear wheel and the thing or beam that holds the car up, and he was so tightly wedged in there that they had to back the car so we could pull him out."

The motorman testified that "I taken hold of his coat sleeve and walked through the car with him, and we got out on the platform. The best of my remembrance, it was his left hand, and when I walked out on the platform I might have held his coat sleeve a little, but not very far, I know, before I turned him loose and run my car." He also stated that the boy stood behind him, and that the first he knew of the boy being hurt was when he heard him scream, and that he got off the car and backed it and took the boy out.

1. It is appellant's principal contention that the plaintiff cannot recover because the act of the motorman in taking the boy on the car with him was an assault, and not within the scope of the servant's employment. But, this action is not founded upon an assault. It is true that the act of the motorman in forcibly leading the boy through the car and out on the front platform thereof amounted to an assault; but that assault was not the proximate cause of the injury, nor the basis of the recovery against appellant.

As held in the former opinion in this case, when the motorman took this boy on to the car, the boy thereby became a passenger and entitled to the same care and protection as any other passenger, as much so as if he had paid his fare and was riding to his destination. It is true, he was not a willing passenger, nor had he given his destination; but the motorman knew his destination better than the boy did as the motorman had selected it for him, and the act of the motorman in requiring the boy to remain on the car, despite the boy's request to be allowed to leave it, created the relation of

carrier and passenger between appellant and the boy; and that relation continued to exist up to the time of his injury. It was upon the failure of the carrier to do and perform its duty as such carrier to him as its passenger that this action was founded—upon the negligence of the motorman in failing to care for this boy whom he had required to ride upon the platform of the car.

The Lewis boy was thirteen years of age at the time of his injury, and small, comparatively, for his age.

It is a rule of the law that a carrier's servants may not compel a passenger to ride in a place upon the conveyance which is not safe under the circumstances, and be free from negligence.

In Chesapeake & Ohio Railway Company v. Crank, 108 S. W., 277, 32 R., 1202, which was an action to recover damages for injuries caused by the wrongful act of a conductor in forcing a passenger from his seat in the coach that he was occupying, and forcibly putting him out on the platform thereof, where he lost his balance and fell to the ground while the train was in motion, this court said:

"If appellee, although not helpless or so drunk as to be incapable of caring for himself, was boisterous or offensive, or vomiting in the car, to the disgust, annoyance and discomfort of the other passengers, the conductor had the right to expel him from the train, after he had stopped it at a place where in the exercise of ordinary care, it would be reasonably safe to put appellant off. But the conductor had no right to remove or eject appellee from the car, and require him to stand or remain on the platform of a moving train. The open and unprotected platform of a moving train is an unsafe and dangerous place for passengers to stand or sit. If appellee was required by the conductor to leave the car and take a position on the platform, the company is liable for any injury sustained by appellee, while exercising ordinary care for his own safety, that resulted from the wrongful act of the conductor."

It was not the act of the conductor in removing him from the coach for which the railway company was held liable in that case; but for the negligence of the conductor in requiring the passenger to remain on the platform of the moving train.

It is true the relation of carrier and passenger would not have been created in the case at bar, had it not been for the act of the motorman in taking the boy on to the car; but the motorman was in charge of the car, and what he did in connection with its operation was done under and by virtue of his employment.

In the case of Davis' Admr. v. Ohio Valley Bank & Trust Co., 127 Ky., 800, 32 R., 627, 106 S. W., 843, 15 L. R. A. (N. S.), 402, a twelve-year-old boy was killed while riding on top of the cage of a passenger elevator in appellee's building. It was said in that case:

"The argument is made that the operator had no authority to permit the boy to ride on top of the elevator, and that if he did so, he was acting outside the scope of his employment, and the master is not responsible. The operator was placed in charge of the elevator, and what he did in connection with its operation was done under and by virtue of his employment."

In the case of Palmer Transfer Company v. Smith, 137 Ky., 319, 125 S. W., 725, 29 L. R. A. (N. S.), 321, 136 Am. St. Rep., 295, John Crowell, who was in charge of appellant's omnibus as driver invited Charlie Smith to ride with him thereon. The bus collided with a street car by reason of the driver's negligence, and appellee was thrown to the ground and injured. It was contended by appellant in that case that the driver of the ominbus had no authority to invite appellee to ride thereon, and that therefore appellant owed appellee no duty. The court, after a review of the authorities, said:

"Applying the doctrine above announced, to the facts in this case, we find that the driver was in charge of the bus, and as such was authorized to receive passengers. He invited appellee, a hunch-back negro boy, who was only fifteen years of age, to ride with him. This act was *within the scope of his employment.* The boy was not merely a guest of the driver, but *became a passenger* to whom appellant owed the same duty that it owed to other passengers."

In the case at bar, there was more than an invitation to the boy to ride upon the street car; there was coercion by the motorman; and that act was within the scope of his employment, and charged the carrier with those duties devolving upon it under the law in respect of its passengers.

2. Complaint is also made by appellant of the instructions. Instruction No. 1 informed the jury that the Lewis boy was a passenger on appellant's car, and defined the duties of the defendant as a carrier; it told the jury that if the motorman compelled the boy to remain on the front platform of the car while the same was in motion, and held the boy in such a careless and negligent manner as to permit him to fall therefrom, the defendant is liable.

Instruction No. 2 informed the jury that if the boy was frightened by the threat of the motorman or others in the presence of the motorman, to deliver him over to the officers of the law, and that as the result of such *fright,* he attempted to alight from the car without the knowledge of the motorman and was injured thereby, the defendant was liable.

Instruction No. 3 told the jury that if the boy was not influenced by fright, but without the knowledge of the motorman, attempted to alight, then they should find for the defendant. The jury was also instructed properly on contributory negligence. These instructions were as favorable to appellant as it was entitled to.

3. It is also insisted by appellant that the court erred in admitting tetimony as to what took place between the Lewis boy and Meyers and Brownfield (the two men who captured him) prior to the time when they delivered him over to the motorman. The court admitted testimony to the effect that Meyers and Brownfield ran after the boys, captured Herman Lewis; and also permitted several witnesses to state what took place before they reached the car where the motorman was; some of the witnesses being permitted to tell that the boy cried and tried to get loose from the two men while being conducted by them to the car. Appellant insists that this testimony was incompetent and prejudicial; and that it should not be held responsible for the acts and words of Meyers and Brownfield prior to the time they came into the presence of the motorman.

That part of the evidence relating to what occurred out of the presence of the motorman was not competent, but what occurred in the presence of the motorman was competent. And what occurred in the presence of the motorman was but a repetition of what had theretofore

occurred. It was proper to permit evidence to go to the jury that in the motorman's presence the two men were forcibly holding the boy, and that they forcibly brought him to the car, and that they forcibly placed him on the car, and into the custody of the motorman; and that the boy was then crying and trying to get loose.

From such competent testimony, the jury would at once conclude that the boy had been caught by Meyers and Brownfield; and that he had tried to get free, and that they had doubtless told the boy what they were going to do with him—just what they told the conductor to do with him.

This evidence was calculated to affect the jury in two ways:   (1) it might have convinced them that the boy was frightened and jumped from the car to prevent his being taken to jail; and had there been no competent evidence of this nature, it doubtless would have been prejudicial; but there was sufficient competent evidence of that fact to convince the jury in that respect; (2) it might have influenced the jury on the question of punitive damages, but in view of the fact that the verdict of the jury was for compensatory damages only, and so expressly states, the evidence, although incompetent, was not prejudicial to the substantial rights of appellant.

Judgment affirmed.